# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 15 2017, 6:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Gregg S. Theobald
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
Deputy Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of:

K.Y. and G.Y. (Minor Children)

and

D.Y. (Father),

*Appellant-Respondent,*

     v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

March 15, 2017

Court of Appeals Case No.
79A05-1609-JT-2160

Appeal from the Tippecanoe Superior Court

The Honorable Faith Graham, Judge

The Honorable Tricia Thompson, Magistrate

Trial Court Cause No.
79D03-1601-JT-6
79D03-1601-JT-7

**Vaidik, Chief Judge.**

# Case Summary

[1] Father appeals the termination of his parental rights to his children, K.Y. and G.Y., arguing that there is insufficient evidence to support the trial court's judgment. Finding that there is sufficient evidence, we affirm.

# Facts and Procedural History

[2] M.Y. ("Mother")[1] and D.Y. ("Father") are married and have two children together, K.Y., born January 13, 2012, and G.Y., born August 29, 2013. In December 2014, Mother took the children to an aunt's house to be looked after for a few hours while she went to get a tattoo. The aunt suffered from medical issues that precluded her from being able to care for the children. Mother was aware of the aunt's medical issues. Father was incapable of watching the children because he was incarcerated at the Clinton County Jail. While watching the children, the aunt suffered a seizure. Attempts to reach Mother were unsuccessful, and as a result, the Department of Child Services (DCS) was called and allegations of child neglect were made. Mother did not return to the aunt's house to pick up her children until the following day.

---

[1] Mother's parental rights were also terminated by the trial court, but she does not appeal the court's judgment.

[3]     DCS filed a Children in Need of Services (CHINS) petition two days later and removed the children from Mother's home. Father provided DCS with a list of relatives who were willing to assume guardianship over K.Y. and G.Y. DCS investigated each relative Father listed, and none of them were found to be suitable guardians for the children. K.Y. and G.Y. were placed in foster care, where they have remained for the duration of these proceedings. Mother was granted supervised parenting time. In January 2015, the trial court held a hearing on the CHINS petition. Mother and Father stipulated to the allegations made by DCS: (1) Father was incarcerated with the earliest expected release date of April 2016; (2) Mother did not return for K.Y. and G.Y. until the following day and was not reachable by phone; (3) Mother failed two drug screens due to methamphetamine use; (4) K.Y. and G.Y. both tested positive for methamphetamine; and (5) Mother cannot adequately care for her children due to her substance abuse. Ex. 1 pp. 28-29. The court adjudicated K.Y. and G.Y. CHINS.

[4]     Father, who has remained incarcerated for the entirety of these proceedings, has an extensive criminal history that dates back to 2002. His criminal history, along with other events relevant to this case, is as follows:

- June 2011 – Father was charged with one count of felony fraud on a financial institution. Father eventually pled guilty to this offense.
- January 2012 – K.Y. was born.
- September 2012 – Father was charged with three counts of felony forgery, one count of felony theft, and one count of felony auto theft. Father eventually pled guilty to these offenses.

- June 2013 – Father failed to appear for sentencing for the crime committed in 2011. The court issued a bench warrant for Father's arrest.
- August 2013 – G.Y. was born.
- October 2013 – Father was charged with one count of felony resisting law enforcement (resulting in injury to the officer), one count of misdemeanor false identity statement, one count of misdemeanor driving while suspended, and one count of misdemeanor operating while intoxicated. Father eventually pled guilty to the charges. He was sentenced in December 2014 to one year, all suspended to supervised probation.
- July 2014 – Father was charged with one count of misdemeanor resisting law enforcement. Father pled guilty to the charge. Father was released on unsupervised probation.
- December 2014 – The June 2013 bench warrant was executed and Father was arrested. Father was sentenced to three years, all executed at the Department of Correction (DOC), for the felony committed in 2011.
- June 2015 – The trial court in the CHINS proceedings ordered Father to engage in programs available to him while incarcerated.
- October 2015 – Father, while still incarcerated for the 2011 crimes, was sentenced to seven years, five years at the DOC and two years suspended to probation, for the September 2012 charged crimes.

Ex. 10; Ex. 1 p. 21.

[5] Since his incarceration, Father made efforts to stay in contact with K.Y. and G.Y. He mailed birthday cards for K.Y. and G.Y. to Mother to give to them during her parenting time. Father sent Mother emails to read to K.Y. and G.Y. during her parenting time. For Christmas 2015 he "released a couple hundred dollars" to Mother for her to provide presents for their children. *Id.* at 144. He called the children or video chatted with them on Mother's phone during her parenting time. These calls and video chats were not approved by DCS, and Father only spoke with the children for approximately five minutes per call

or video chat. *See* Tr. Vol. II pp. 72, 152, 214. Mother exercised parenting time three days a week, but Father called only once or twice a week. *Id.* at 149-150. Father never asked DCS to grant him permission to have phone or video contact with K.Y. and G.Y. because "it takes forever" to get a response. *Id.* at 74.

[6]     Furthermore, Father has not exercised any in-person parenting time with his children since being incarcerated in 2014. During these proceedings, Father has been incarcerated at three different facilities. Each facility has been able to provide an area for in-person parenting time. Father was never told by DOC employees that he was ineligible for in-person parenting time or ineligible to utilize the parenting-time areas. Father never contacted DCS or the trial court to request in-person parenting time.

[7]     In January 2016, DCS petitioned the court to terminate Mother and Father's parental rights to K.Y. and G.Y. The court held a two-day, joint hearing on DCS's petitions. Multiple witnesses testified at trial, including Father, a DCS representative, and the Court Appointed Special Advocate (CASA).

[8]     During the hearing, Father acknowledged his history of criminal activity and that he had been incarcerated for the entirety of these proceedings. He testified that he had participated in multiple programs during his current incarceration. Before the court's June 2015 order to participate in programs, Father completed Christians Against Substance Abuse (no time cut) and Thinking for a Change (no time cut). After the court's order, Father completed: vocational training for

construction (ninety-day time cut), Inside Out Dads (no time cut), Doctor Dads (no time cut), Master Student Master Employee vocational program (three-month time cut), and substance abuse counseling (six-month time cut). Father stated that he did not believe he had a substance-abuse problem but took the class because of Mother's issues and the time cut. "I don't believe I have a substance abuse problem as of today, but I do have substance abuse in my family . . . it's just something I felt I could benefit from and the time cut to be honest, I can benefit from it twice." Tr. Vol. III p. 79; *see id.* at 67. Father also completed his GED while incarcerated (six-month time cut). The record is unclear if Father participated in and completed a culinary-arts vocational program (three-month time cut if completed). *See* Tr. Vol. II pp. 135-43. Father stated that he had issues getting his time cuts applied to his sentence and had written "three or four times" to the court to have the issues resolved. Tr. Vol. III pp. 77-78. Based on these time cuts, Father's earliest release date is September 14, 2017.[2] Father also acknowledged that he still has to serve a two-year term of probation after his release from prison.

[9] When asked about his plan upon release, Father stated that he intends to reunite with Mother. The two of them will move in with his brother—one of the people not cleared by DCS to have guardianship of the children. Father

---

[2] Father testified at trial that his earliest release date was June 14, 2018. Tr. Vol. II p. 127. However, the Department of Correction's Offender Search lists Father's projected release date as September 14, 2017. https://www.in.gov/apps/indcorrection/ofs/ofs (last visited Mar. 13, 2017).

acknowledged that Mother has issues with methamphetamine use that have yet to be addressed, but he still plans on reuniting with her.

[10] Also testifying at the hearing was Shalonda Haskins, a permanency case worker with DCS. She stated that due to Father's incarceration DCS has not been able to provide him with any services. She recommended that Father's parental rights be terminated because the circumstances that led to the removal of K.Y. and G.Y. were not likely to be remedied. She based her recommendation on Father's criminal history and current incarceration. She outlined that DCS's plan for K.Y. and G.Y. was adoption.

[11] The CASA, Kevin Hintzman, also recommended termination of Father's parental rights. The CASA stressed the importance of permanency for K.Y. and G.Y.:

> I also believe that due to the fact that [K.Y. and G.Y.] are so young and they have spent such a large percentage of their very short lives outside the care of their parents that the longer that this is delayed the more trauma they are going to experience because of their – because of this. I believe that they need permanency and I believe that they cannot achieve that permanency in any reasonable amount of time with either of the biological parents. I believe that for us to do what's right for these children we need to move forward, we need to have them in a safe, loving home that's willing to adopt them and be a forever parent to them.

Tr. Vol. III p. 38. He strongly advocated that adoption was in the best interests of K.Y. and G.Y. When questioned about whether he had observed Father

with the children, the CASA said he had not and that seeing Father interact with K.Y. and G.Y. would not change his opinion. "I didn't have a worry about the parents' ability to parent, I had to worry about their ability to do it safely without intoxication and to be present. And so there was no need for me to see something I already understood to be true." *Id.* at 52.

[12] The trial court agreed with DCS and the CASA and terminated Father's parental rights. The court, in its order, entered findings of fact and conclusions. The court found that Father had committed new criminal offenses "several times" while on probation; that Father had failed to appear for court "approximately ten times, including failing to appear for sentencing hearings"; at trial, Father's discussion of the programs he had participated in "focused more on the time cuts received than the content of those classes"; Father intended to maintain his relationship with Mother despite her "active methamphetamine use"; Father had not exercised any in-person parenting time with K.Y. and G.Y. since being incarcerated; and "Father's criminal behavior did not change or stop after the birth of his children." Appellant's App. p. 24-25. The court concluded that the children need stability in their lives and that Father could not provide that stability given his inability to "refrain from criminal behavior." *Id.* at 25. The trial court found, by clear and convincing evidence, that the following allegations were true: there is a reasonable probability that the conditions resulting in the removal of K.Y and G.Y. from the home or reasons for placement outside of the home will not be remedied; there is a reasonable probability that continuation of the parent-child

relationship poses a threat to the well-being of the children; termination is in the best interests of the children; and the plan for adoption is satisfactory.

[13] Father now appeals.

# Discussion and Decision

[14] Father contends that there is insufficient evidence to support termination of his parental rights. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence clearly and convincingly supports the trial court's findings and whether the findings clearly and convincingly support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[15] A petition to terminate parental rights must allege, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231.

[16] Father challenges three parts of the trial court's judgment. First, he argues that the trial court erred when it concluded that there is a reasonable probability that the conditions that resulted in the removal of K.Y. and G.Y. or the reasons for their placement outside the home will not be remedied.[3] Second, Father contends that termination of his parental rights is not in the best interests of K.Y. and G.Y. Last, Father asserts that DCS did not present a satisfactory plan for the care and treatment of K.Y. and G.Y.

---

[3] Father also argues that there was insufficient evidence to support the trial court's conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the children's well-being. Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires clear and convincing evidence of only one of the circumstances listed in subsection (B). *See R.J. v. Ind. Dep't. of Child Servs.*, 56 N.E.3d 729 (Ind. Ct. App. 2016). Because we conclude that there is sufficient evidence to support the trial court's conclusion that there is a reasonable probability that the conditions resulting in the children's removal will not be remedied, we do not address this argument.

# I. Reasonable Probability That the Conditions Resulting in Removal or the Reasons for Placement Outside the Home Will Not Be Remedied

In determining whether the conditions that led to the removal will be remedied, the trial court engages in a two-step analysis. "The court first identifies the conditions that led to removal and then determines whether there is a reasonable probability that those conditions will not be remedied." *In re A.W.*, 62 N.E.3d 1267, 1273 (Ind. Ct. App. 2016) (citing *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014)). A parent's fitness is measured at the time of the termination hearing and changed circumstances are balanced against habitual conduct to see if there is a "substantial probability of future neglect or deprivation." *Id.* Habitual conduct includes a parent's criminal history. *In re A.D.S.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*.

K.Y. and G.Y. were placed in foster care, in part, due to Father's incarceration. Father acknowledges that the trial court correctly found that Father was incarcerated and unable to care for his children. He compares his situation to the father in *In re K.E.*, 39 N.E.3d 641 (Ind. 2015), and relies heavily on our Supreme Court's opinion in support of his argument that there is insufficient evidence that there is a reasonable probability that the conditions that resulted in the removal of K.Y. and G.Y. or the reasons for their placement outside the home will not be remedied.

In *K.E.*, the father was incarcerated before the birth of K.E. and throughout the CHINS proceeding. K.E was removed from the mother's custody and a

paternal aunt was granted guardianship. At the termination hearing, DCS recommended termination of the father's parental rights, but the CASA stated that termination should be delayed pending the father receiving time cuts and that delaying the proceedings would not harm K.E. The trial court ordered termination of the father's parental rights. Our Supreme Court reversed the trial court, in part on the grounds that insufficient evidence was presented to support a reasonable probability that the conditions that resulted in removal would not be remedied. The Court reached this conclusion based on the fact that K.E.'s father had made "substantial efforts" to better his life by participating in twelve programs, "the majority of which were completed **voluntarily** and did **not** result in sentence reductions." *Id.* at 648 (emphases added). The court also recognized that the father exercised in-person parenting time with K.E. every other week and spoke to K.E. on the phone nightly. "There is seemingly nothing else that Father could have been doing to demonstrate his dedication to obtaining reunification." *Id.* at 649.

[20] There are several distinguishing circumstances between Father and the father in *K.E.*: (1) Father was incarcerated **after** the birth of K.Y. and twice more **after** the birth of G.Y.; (2) K.Y. and G.Y. have been in foster care with a non-relative serving as their guardian; (3) the majority of services Father has participated in occurred after being ordered to do so by the court; (4) Father has not exercised in-person parenting time with K.Y. or G.Y. since being incarcerated in December 2014; (5) Father called or video chatted with K.Y. and G.Y. only once or twice a week; (6) both DCS and the CASA recommended termination

of Father's parental rights; and (7) the CASA testified that K.Y. and G.Y. would be harmed if permanency was delayed. In addition to these differences, Father has also not requested the trial court or DCS grant him in-person parenting time or permission to call or video chat with K.Y. and G.Y. Unlike *K.E.*, there is substantially more that Father could have done to demonstrate his dedication to obtaining reunification with his children.

[21] Furthermore, the trial court found that Father, while on probation, continued to commit criminal offenses. It also found that he failed to appear in court on approximately ten occasions, including sentencing hearings. Father's long history of criminal activity, especially his actions after the births of K.Y. and G.Y., is evidence that criminal activity is habitual conduct. Balanced against his participation in services, we conclude that there is a "substantial probability of future neglect or deprivation." *E.M.*, 4 N.E.3d at 643. The trial court did not err when it concluded that there is a reasonable probability that the conditions resulting in the removal of K.Y. and G.Y. or the reasons for their placement outside the home will not be remedied.

## II. Best Interests of the Children

[22] Father also contends that the trial court erred in concluding that termination of his parental rights is in the best interests of K.Y. and G.Y. Father argues that the trial court failed to enter multiple findings of fact that favor him retaining his parental rights. This argument is another way of asking this Court to reweigh the evidence, which we will not do.

[23] Father further contends that the opinions by DCS and the CASA that he cannot provide permanency for the children, by itself, is not enough to support termination. Appellant's Br. p. 26 (citing *In re A.S.*, 17 N.E.3d 994, 1006 (Ind. Ct. App. 2014), *trans. denied*). To determine what is in the children's best interests, the trial court must look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. In doing so, the trial court must subordinate the interests of the parent to those of the children. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* "A parent's historical inability to provide a suitable environment [for the children], along with the parent's current inability to do the same, supports a finding that termination of parental rights is in the best interests of the children." *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013), *reh'g denied*. "[A] child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of service providers may support a finding that termination is in the child's best interests." *In re A.S.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010), *trans. dismissed.*

[24] The State presented evidence beyond the recommendations of DCS and the CASA that Father's rights should be terminated because of the children's need for permanency. As stated above, the State showed that Father has continued to engage in criminal activity since the births of both K.Y. and G.Y. Father's criminal history spans over fifteen years, and he has given the court no reason to believe that he will not reoffend upon release. Additionally, Father has not been able to provide for his children since the CHINS proceedings began due to

his continued incarceration. At the earliest, Father will not be able to begin providing for the children until his anticipated release in September 2017. However, upon release from prison, Father has stated that he plans on living with Mother, who continues to struggle with methamphetamine use. His plan is to live with her at his brother's house, a relative not cleared by DCS to have guardianship over K.Y. and G.Y. Father has failed to establish a history of being able to provide for his children or a current ability to do so. We conclude that the trial court did not err when it determined that termination of Father's parental rights was in the children's best interests.

## III. Satisfactory Plan for the Care and Treatment of the Children

Father's final argument is that the plan for K.Y. and G.Y. going forward is not satisfactory. Father does not challenge any specific findings of fact entered by the trial court or cite to any case law to support his argument. Rather, Father's entire argument rests on asking this Court to make additional findings of fact that were not included in the trial court's judgment. Again, this argument is nothing more than an invitation to reweigh the evidence, which we decline to do.

Affirmed.

Bradford, J., and Brown, J., concur.